**In re PLITT AMUSEMENT CO. OF WASHINGTON, INC., Debtor.**

**Bankruptcy No. LA–99–12250–SB.**

United States Bankruptcy Court,
C.D. California,
Los Angeles Division.

May 4, 1999.

Arnold Kupetz, Los Angeles, CA, Trustee, pro se.

Howard M. Ehrernberg, Wesley Avery, Los Angeles, CA, for trustee.

Steven G. Polard, Perkins Coie, Los Angeles, CA, for Pritt Amusement Co.

## NOTICE OF FILING AMENDED OPINION GRANTING MOTION TO REJECT LEASE

SAMUEL L. BUFFORD, Bankruptcy Judge.

### I. Introduction

The motion before the court raises two issues related to a trustee's rejection of an unexpired lease pursuant to Bankruptcy Code, section 365, 11 U.S.C. § 365 (West 1998). The first issue is whether the lease in this case is a separate transaction from two other leases for different business locations and from a related installment purchase of the businesses at the three locations, so that the lease may be separately rejected. The second issue is whether, if the various instruments constitute a single contract between the parties, the lease here at issue is severable from the other parts of the transaction, so that the trustee can reject it separately.

The court holds that the lease is not such an integral part of the larger transaction that the entire transaction must be assumed or rejected as a whole. Indeed, the court finds that the installment sale is not an executory contract at all, because it has been substantially performed by the sellers. Second, the court finds that, even if the larger transaction constitutes a single contract between the parties, the lease is severable and independently assumable or rejectable.

### II. FACTS

When the debtor filed this chapter 7 case, it operated seven motion picture theaters in Washington. Plitt purchased three of these theaters in 1990 from two Washington general partnerships, Island Cinemas ("Island") and Plaza Cinemas ("Plaza") (collectively "Cinemas").[1] One theater is in Mt. Vernon, a town located between Seattle and Bellingham. A second is located some 40 miles away in Oak Harbor. The third is located in Moses Lake, a town some 200 miles to the southeast in Eastern Washington. Each of these towns is quite small: the largest is Mt. Vernon, with a population of 17,647. This motion concerns only the Mt. Vernon lease, which the trustee has determined to be burdensome to the estate.

The 1990 purchase transaction involved six documents: a purchase agreement for the business of the three theaters, a promissory note to pay the balance of the purchase price over ten years, an unrecorded security agreement to secure the note by equipment in the theaters, and three theater leases with twenty-year terms.

Prior to the debtor's purchase of the business, Cinemas owned the property where theaters were located. However, Cinemas did not sell the real estate to the debtor. Instead, Cinemas leased the real estate at each of the theater locations to the debtor. Each lease contains four five-year options to renew after the initial twenty-year term. In 1995 the parties amended the promissory note to reduce the purchase price by one-third.[2]

---

1. The two general partnerships are linked by a common partner, John Solin.

2. In 1992 the parties amended the purchase agreement to resolve a parking problem not relevant to this case.

## III. LEGAL ANALYSIS

Arnold L. Kupetz, Plitt's chapter 7 trustee, moves to reject the Mt. Vernon lease. The trustee finds in his sound business judgment that the lease has no realizable value for the benefit of the bankruptcy estate, because the rent is at the market rate. Cinemas oppose the trustee's motion, and argue that the three leases, the purchase agreement and the note constitute one indivisible, nonseverable transaction[3] that the trustee must reject or assume in its entirety.

■■■ Subject to court approval, a chapter 7 trustee may assume or reject any executory contract or unexpired lease of the debtor. Bankruptcy Code § 365, 11 U.S.C. § 365 (1998). An executory contract or unexpired lease does not become property of the bankruptcy estate until it is assumed. *See Otto Preminger Films, Ltd. v. Qintex Entertainment, Inc. (In re Qintex Entertainment, Inc.),* 950 F.2d 1492, 1495 (9th Cir.1991). The assumption or rejection of an executory contract or unexpired lease is governed solely by federal bankruptcy law. *See id.; See also In re David Orgell, Inc.,* 117 B.R. 574, 575 (Bankr.C.D.Cal.1990); *In re Wheeling–Pittsburgh Steel Corp.,* 54 B.R. 772, 779 (Bankr.W.D.Pa.1985). Nothing in state contract law or property law corresponds to such assumption or rejection. The trustee cannot retain the beneficial aspects of an executory contract or unexpired lease while rejecting its burdens. *See David Orgell,* 117 B.R. at 576; *see also In re Ritchey,* 84 B.R. 474, 476 (Bankr. N.D.Ohio 1988).

■■ Section 365 permits a trustee (or a debtor in possession) to pick and choose among the debtor's executory contracts and unexpired leases, and to assume those which benefit the estate and reject those which do not. *See, e.g., Metropolitan Airports Comm'n v. Northwest Airlines, Inc.,* 6 F.3d 492, 494 (7th Cir.1993). Section 365 establishes a structure under which a trustee may evaluate the advantages and disadvantages of an executory contract or unexpired lease. If the net performance on both sides would benefit the estate, the contract or lease should be assumed and either performed or assigned. On the other hand, if the net performance on both sides would be detrimental to the estate, the contract or lease should be rejected. *See* 2 WILLIAM L. NORTON, JR., BANKRUPTCY LAW AND PRACTICE 2d § 39.1 (1997).

This is not a case where the trustee is attempting to assume part of a contract or lease, and to reject the remainder. Courts have properly rejected such a tactic. *See, e.g., Pacific Express, Inc. v. Teknekron Infoswitch Corp. (In re Pacific Express, Inc.),* 780 F.2d 1482, 1488 (9th Cir.1986). In this case the trustee has moved to reject one unexpired lease. The trustee has left the other six leases, as well as any executory contracts, for another day.

### A. Applicable Law

The legal regime governing bankruptcy cases is a mixture of federal and state law. Federal bankruptcy law determines some rights of the parties. Where bankruptcy law does not govern, the underlying non-bankruptcy law (usually state law) determines the rights of the parties. *Cf. Butner v. United States,* 440 U.S. 48, 54–55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979) (holding that property interests are created and defined by state law; unless some federal interest requires a different result, there is no reason why such interest should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding).

Frequently the best method of analysis is to begin by examining the rights of the parties outside of bankruptcy, usually based on state law. After this analysis, we then examine the impact of applicable

---

3. The security agreement is not included in this contention, because Cinemas concede that their failure to record their UCC–1 Financing Statement makes the security interest avoidable by the trustee.

bankruptcy law, to determine whether it changes those rights.

## B. State Law Analysis

In this case the leases and the promissory note provide that they are governed by Washington law. In contrast, the purchase agreement specifies that it is controlled by California law. However, the parties have briefed only Washington law on this motion. Nonetheless, we must also examine the rights of the parties under California law, and determine which state law to apply if the rights vary depending on which state law governs.

### 1. Washington Case Law

Washington case law[4] requires a detailed analysis of each case to determine whether separate instruments constitute an integrated, non-severable contract. The Washington Supreme Court has articulated the general rule:

> where several instruments are made as part of one transaction, they will be read together, and each will be construed with reference to the other. This is true, although the instruments do not in terms refer to each other.

*Levinson v. Linderman,* 51 Wash.2d 855, 322 P.2d 863, 866 (1958); *accord, Boyd v. Davis,* 127 Wash.2d 256, 897 P.2d 1239, 1241 (1995).

No reported Washington case addresses the integration of one non-residential lease with others for different business locations, or with a related purchase agreement and secured promissory note. However, several reported cases provide useful principles to help resolve the issues before the court.

In *Levinson* the court found that the plans and specifications for a school building were integrated with the construction contract and the performance bond,[5] to bar the assignment to a bank of a progress payment under the contract where such

assignment was prohibited by the plans and specifications. *See Levinson,* 322 P.2d at 866. The court found support for its conclusion in three factors: first, the contract referred to the plans and specifications for a description of the work to be performed; second, the performance bond incorporated both other documents as part of the bond; third, the contract was a printed form copyrighted by the American Institute of Architects, designed for the specific purpose of making all of the documents one contract. *See id.*

Two Washington cases have held that two separate agreements signed at the same time constitute a single contract. In *Lynch v. Higley,* 8 Wash.App. 903, 510 P.2d 663, 671 (1973), the court found that an employment agreement and an agreement to buy out business associates, signed at the same time, created a single set of dependent obligations, so that the discharge of the employee for cause discharged the obligation of his associates to sell him their stock. In *Turner v. Wexler,* 14 Wash.App. 143, 538 P.2d 877, 879–80 (1975), the court found that an amendment to an installment contract for the sale of real estate lots constituted a single agreement with a performance bond to install streets, sewers, storm sewers and water. As in *Levinson,* the court arrived at its conclusion in each of these cases after a careful examination of each of the instruments at issue.

In contrast to *Lynch* and *Turner,* in *Cordell v. Regan,* 23 Wash.App. 739, 598 P.2d 416 (1979), the court found that a cost breakdown sheet that was submitted to a bank (together with a construction agreement and a building specifications form) for construction funding for a single family residence was not a part of the contract between the parties. Reading all three documents together, the appellate court sustained the trial court's judgment that

---

4. Washington apparently lacks any statutes relevant to this issue.

5. The court also found that a parallel set of documents for the construction of a teacher's cottage (presumably on the same site) were part of the same contract. *Id.*

the parties had not intended to be bound by the amounts contained in the cost breakdown sheet, because the documents treated the cost breakdown sheet as merely an estimate and not as a binding agreement on the price of the contract. *See id.* at 419. This permitted the introduction of parol evidence as to the ultimate price that the purchaser was required to pay. *See id.*

The only Washington reported case discovered that rules on the severability of leases is *Baldwin v. National Safe Depository Corp.*, 40 Wash.App. 69, 697 P.2d 587 (1985), which involved a lease of four signs. The lease provided for a single monthly rental, and did not apportion the rental between the signs. A dispute arose concerning the quality of three of the signs, and the lessee ceased paying rent. The court found that the contract was indivisible. However, it sustained the jury apportionment of liquidated damages based on the lessor's allocation of rents among the signs. Unlike the case before this court, *Baldwin* involved a single instrument for all four signs: it thus did not involve the interpretation of separate instruments.

*Boyd v. Davis*, 127 Wash.2d 256, 897 P.2d 1239, 1241 (1995), is the Washington case presenting facts that are most similar to those before this court. Boyd involved the purchase of an ophthalmological practice with five separate documents: an asset sale agreement, an employment agreement and covenant not to compete, a security agreement, an option agreement, and a lease. After a dispute arose, the seller sought to rescind all five agreements, while the buyer sought to rescind only the employment agreement and covenant not to compete. The arbitrator found in favor of the buyer, but the trial court vacated the arbitration award and found that the documents constituted a single contract that was not severable. The appellate court reversed the trial court and reinstated the arbitration award. The Washington Supreme Court affirmed, on the ground that the trial court could not conduct the detailed review of the five documents necessary to make such a determination without conducting a trial de novo, which is not permitted after an arbitration award. *See id.* at 1241–42. Thus the court in *Boyd* did not reach the issue of whether the lease constituted an integrated contract with the other instruments signed on the same day, or whether it could be severed from the other instruments.

■ The foregoing case law [6] establishes several principles under Washington law for determining whether the trustee may separately reject the Mt. Vernon lease. First, the court must examine all of the instruments together, to determine whether they constitute a single integrated agreement, or separate agreements such that the trustee may reject the Mt. Vernon lease without considering the other documents. Second, if the court finds that the instruments constitute a single integrated agreement, then the court must consider whether the Mt. Vernon agreement can be severed from the remainder of the transaction, and rejected by the trustee.

### 2. California Law

California has both a statute and case law on this subject, neither of which has been briefed by the parties. California Civil Code § 1642 provides:

> Several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together.

---

**6.** The parties cite several other Washington cases, but the court finds them inapposite, because each involved the severability of obligations under a single instrument. *See Mutual of Enumclaw Ins. Co. v. Cox,* 110 Wash.2d 643, 757 P.2d 499 (1988) (insurance policy providing that it was void if induced by fraud of the insured); *Saletic v. Stamnes,* 51 Wash.2d 696, 321 P.2d 547, 549 (1958) (joint venture agreement); *Sunset Shingle Co. v. Northwest Electric and Water Works,* 118 Wash. 416, 203 P. 978 (1922) (contract for electrification of factory and construction of steam plant for heating it).

CAL.CIV.CODE § 1642 (West 1999). This provision, enacted as part of the original Field Code adopted in California in 1872, is a restatement of the common law. *See Berg Metals Corp. v. Wilson,* 170 Cal. App.2d 559, 339 P.2d 869 (1959).

▮ Under California case law, whether the parties intend multiple instruments to constitute a single contract must be decided on a case by case basis. *See Pilcher v. Wheeler,* 2 Cal.App.4th 352, 3 Cal.Rptr.2d 533, 535 (1992). In addition, it is not necessary that the instruments be considered as one contract for all purposes. *See Malmstedt v. Stillwell,* 110 Cal.App. 393, 294 P. 41 (1930).

For this court's purposes, the severability issue under California law is governed by *Moore v. Pollock (In re Pollock),* 139 B.R. 938 (9th Cir. BAP 1992).[7] In Pollock the debtor bought a campground business in a transaction that included a promissory note for the unpaid portion of the purchase price, a sublease of the campground property in which the seller remained as the master lessee, and a security agreement for the note under which the subleasehold and related property were the collateral. The Ninth Circuit Bankruptcy Appellate Panel affirmed the trial court's determination under California law that the note payments were severable from the obligations under the sublease, so that the debtor in possession could assume the sublease without curing the defaults under the note.

The court in *Pollock* assumed that the note, sublease and security agreement constituted a single contract between the parties, apparently because the parties did not argue otherwise. Nonetheless, it found that the note payments were severable from the sublease. In making this determination, it relied on three factors: (1) whether the nature and purpose of the obligations are different; (2) whether the consideration for the obligations is separate and distinct; and (3) whether obligations of the parties are interrelated. *Id.* at 940–41.

The BAP affirmed the trial court based on three considerations. First, the sublease and the note were separate documents that were not expressly incorporated into each other. Second, the sublease was supported by its own consideration: the structure of the transaction was the sale of a business, which gave rise to a secured promissory note. The note payments were not a form of rent under the sublease, but a secured claim against the security. Furthermore, the note lasted for 17 years, while the term of the sublease was 30 years. Third, the court resolved any ambiguity against the seller because his attorney drafted the sublease.

This case resembles *Pollock* in many respects. Like *Pollock,* this case involves leases, a purchase agreement and a secured note. Like *Pollock,* payments under the note are for the purchase of the business, and not the payment of rent. Like *Pollock,* the lease is supported by its own consideration, and lasts much longer than the payments under the note. Furthermore, unlike *Pollock,* the lease in this case does not contain a cross-default clause, that makes a default under the note a default under the lease.

Thus California law requires the same detailed examination of the instruments at issue as Washington law requires to determine whether they constitute a single contract between the parties. If the court finds that they constitute a single contract, then it must follow the guidance of *Pollock* to determine whether the Mt. Vernon lease is severable from the remainder of the contract, so that the trustee can reject it alone.

**3. Language of the Instruments**

Both California and Washington law teach that the court must make a careful

---

7. *See Coyne v. Westinghouse Credit Corp. (In re Globe Illumination Co.),* 149 B.R. 614, 617–22 (Bankr.C.D.Cal.1993) (bankruptcy court bound by Ninth Circuit Bankruptcy Appellate Panel decisions).

examination of the instruments at issue to determine whether (1) the lease is a single integrated agreement together with the other instruments, and (2) if so, whether it is severable from the other instruments.

 Absent ambiguity in the terms of the instruments, the intent of the parties must be gleaned from the terms contained within the four corners of the documents involved. *See, e.g., Pollock*, 139 B.R. at 940 (applying California law); *Boyd*, 897 P.2d at 1241; *Mutual of Enumclaw Ins. Co. v. Cox*, 110 Wash.2d 643, 757 P.2d 499. Parol evidence on the intent of the parties is particular inadmissible where, as here, all of the instruments in question (except the note) contain integration clauses excluding such parol evidence.

### a. Structure of the Transaction

 The court first examines the overall structure of the transaction in this case, to determine the role of the Mt. Vernon lease therein. Overall, the court finds that the transaction had two principal features. First, Cinemas sold their businesses to the debtor for a cash down payment and a deferred payment over ten years under the promissory note, which was secured pursuant to the unperfected security agreement. Second, Cinemas leased the three theaters to the debtor for a period of twenty years, with an option to renew for up to twenty more years.

The leases in this case differ in important respects from the sales transaction. The promissory note provides for complete payment of the purchase price ten years after the date of the purchase of the business. However, each lease has a duration of twenty years, during which time the obligation to pay rent continues. Each lease also contains an option to renew for up to twenty more years. Clearly the parties contemplated that the seller would remain the landlord under each of the

leases for an indefinite duration, decades after the completion of the payment of the purchase price of the business.

It is true that the three leases, the purchase agreement and the note were all executed on the same day in 1990. This factor standing alone could support an inference that the leases are not independent. However, each lease functions independently: each contains provisions regarding rent amount, rent due date, commencement and termination dates of the lease, and location of the leased real property. The purchase agreement and the note similarly stand alone to describe the subject assets, the price, and the manner of payment. Most importantly, the leases are designed to continue long after the purchase price is fully paid.

### b. Specific Provisions in the Instruments

The court has examined the specific terms of each of the instruments, to get a full picture of the intent of the parties. The court finds that they are consistent with the foregoing analysis of the structure of the agreement between the parties. The court also finds very few provisions in any of the instruments to support an inference that they were intended as a single integrated contract.

Except for three provisions, the Mt. Vernon lease does not mention the other instruments. None of these three provisions makes the lease an integral part of a larger agreement between the parties. Each of the other leases is identical in this respect.

The first such provision is a cross-default provision, which specifies that a breach of the payment obligations under either of the other two leases also constitutes a breach of the payment obligation in the lease at issue. The note also provides that any default thereunder constitutes a default under each lease.[8] However, the

---

8. Notably, the latter provision is not contained in any of the leases. Their cross-de- fault provisions relate only to the other leases.

discussion *infra* shows that, in the bankruptcy context, cross-default provisions do not integrate otherwise separate transactions. Thus the cross-default provision does not support Cinemas' position.

A second lease provision that refers to other documents is the offset provision. It provides:

> Tenant shall have the right to offset any amounts due Tenant under that certain Purchase Agreement executed concurrently herewith and by and between Landlord, as Sellers, and Tenant, as Buyer, against any amounts Tenant owes Landlord pursuant to this lease. Exercise by Tenant of this right of offset shall not constitute a breach of this Lease.

This is the only provision in the leases that refers to the purchase agreement. Its purpose appears to be solely to provide for the settlement of such items as prorated taxes and insurance as of the closing date. This provision, does not support an inference that this lease is integrated with any other agreements for the purposes of this motion.

The third arguably relevant provision in the leases is an integration clause, which refers to "any instruments executed by the parties concurrently herewith." The amended purchase agreement contains a similar provision. The purpose of an integration clause of this type is to prevent the introduction of parol evidence of other agreements not contained in a particular instrument. This is a wholly separate issue from whether the various instruments constitute a single agreement for the purposes of assumption or rejection. Thus this provision is irrelevant to the dispute before the court.

The purchase agreement repeatedly refers to the leases. However, each such reference treats the leases as objects that the debtor was purchasing under the contract, just as the debtor could have purchased office buildings or automobiles.

These provisions do not refer to the substantive provisions of the leases, and thus do not incorporate the lease into the purchase agreement.

The court concludes that the parties intended that each lease be an independent obligation of the parties. The debtor obtained the leasehold interests as part of the transaction, but the contents of the lease agreements were not part of the purchase itself. Each lease was supported by separate consideration, and will continue to exist for decades after the completion of payment for the purchase. In consequence, a detailed examination of the provisions of the instruments, as well as an analysis of the overall structure of the transaction leads to the conclusion that the Mt. Vernon lease is a separate obligation between the parties entirely apart from the other agreements. Thus the trustee may reject this lease apart from the other instruments.

**c. Severability**

 Alternatively, if the six instruments constitute a single integrated contract, the court must determine whether the Mt. Vernon lease is severable from the other parts of the contract. The court finds that, even if the transaction constitutes such a single contract, this lease is severable.

 Severability is determined by the intent and the actions of the contacting parties. *See Qintex Entertainment, Inc.,* 950 F.2d at 1496. Severability is a question whether parts of a contract or lease, or part performance thereunder, can be separated and treated as independent legal obligations.

The purchase agreement contains a severability provision, which states that, if any provision is rendered invalid, the remaining portions of the contract are not affected thereby.[9] Thus the parties intended that any portion of the purchase agreement, and any other instrument with

---

9. None of the other instruments contains a severability clause.

which it may be integrated (including the three leases and the secured note) stand alone, and not depend on any other instrument for its survival. Unlike the insurance policy in *Cox*, 110 Wash.2d 643, 757 P.2d 499, which provided that any fraud in its inception invalidated the entire policy, the purchase agreement stands alone, no matter how many leases are invalidated.

Such a severability clause is pivotal under Washington law. *In re Steffen*, 181 B.R. 981 (Bankr.W.D.Wash.1995), involved a secured installment sale for an automobile, which included a balloon payment at the end of the term and an option to resell the vehicle to the lender. The bankruptcy court found, under Washington law, that the installment sale was severable from the option to resell, and that only the latter was an executory contract subject to assumption or rejection. *See id.* at 985–87. The court found that the two parts were severable, because the contract contained a severability clause that stated: "[i]f any part of this contract is not valid, all other parts remain enforceable." *See id.* at 987; *see also Machen, Inc. v. Aircraft Design, Inc.*, 65 Wash.App. 319, 828 P.2d 73, 81 (1992) (refusing to imply severability in large part because there was no severability clause).

In its independent research the court has found no California case law on the impact of a severability clause on this issue. Because the parties have chosen not to brief this issue, the court assumes without deciding that the outcome under California law would be the same as that under Washington law.

The court concludes that the contract language, as interpreted under both Wash-

ington law and California law (construed in the light of *Pollock*), indicates that the Mt. Vernon lease is severable from the other instruments in the transaction here at issue, so that the trustee may reject it separately.

### C. Federal Bankruptcy Law Analysis

The foregoing analysis indicates that state law (whether that of Washington or California) fully supports the right of the trustee to reject separately the Mt. Vernon lease. The court also finds an independent basis in federal bankruptcy law for permitting this rejection.[10]

### 1. The Transaction and the Leases

As to the relationship between the transaction here at issue and the three leases, this case is much like *Pacific Express*, a Ninth Circuit case binding on this court, which is ignored by the parties. *Pacific Express*, 780 F.2d 1482. In *Pacific Express*, the debtor purchased a package of telecommunications equipment on a secured installment sales contract, together with a maintenance agreement and software needed to run the equipment. While the court agreed with the parties that these instruments arose out of a single transaction, the court found that this did not mean that they constituted a single contract for the purposes of section 365. *See id.* at 1486. If the sales agreement could be disaggregated from the agreement to maintain and license software for the equipment, the court held, there would be two contracts that must be analyzed separately for the purposes of section 365. *See id.*

Like Cinemas here, the seller argued in *Pacific Express* that the debtor could not

---

**10.** No federal case has specifically held that state law governs whether multiple obligations in a transaction are severable. Rather, the cases that have applied state law to the severability issue have done so incidentally to their holdings. *See, e.g., Qintex Entertainment, Inc.*, 950 F.2d at 1496 (applying state law, without discussion, to a severability issue); *Byrd v. Gardinier, Inc. (In re Gardinier, Inc.)*, 831 F.2d 974, 975–76 (11th Cir.1987) (same); *Pollock*, 139 B.R. at 940 (stating, *in dicta*, that "[w]hether multiple obligations in an agreement or transaction are severable is a question of state law"); *In re T & H Diner, Inc.*, 108 B.R. 448, 453 (D.N.J.1989) (citing to *Gardinier, supra*); *In re Cafe Partners/Washington 1983*, 90 B.R. 1, 6 (Bankr.D.C.1988) (whether a lease is entire is "usually" a question of state law).

avoid the unperfected security interest [11] in the equipment unless it assumed the underlying sales contract and cured all defaults and assured future payment in full. The Ninth Circuit found that this would defeat the purpose behind section 365. *See id.* at 1487. In particular, the court held that the installment sale was not an executory contract that was subject to assumption or rejection, because the seller had completed delivery, and thus had substantially performed. Only the maintenance agreement and the software license remained executory, and the court found that they were sufficiently separate from the sales agreement to be regarded as separate contracts for the purposes of section 365. *See id.* at 1488.

The court finds that *Pacific Express* supports the decision that the trustee may reject the Mt. Vernon lease. Bankruptcy law is not subject to artful drafting. Business lawyers are accustomed to working with statutes that can be superseded by agreement of the parties. Many provisions of partnership laws, business corporation laws and the Uniform Commercial Code fall into this category. The statutory provisions govern only where the parties have not adopted specific agreements on the subjects.

Bankruptcy law is otherwise. Its chief purpose is to relieve debtors of their improvident agreements. At the same time, it permits a trustee or debtor in possession to take advantage of those agreements that are beneficial, for the benefit of creditors. A trustee or debtor in possession must be permitted to pick and choose, to make this determination authorized by section 365.

### 2. The Three Leases

Bankruptcy law also requires that each of the three leases be treated separately for the purposes of assumption or rejection under section 365. This conclusion derives from the basic purposes underlying a trustee's right to assume or reject executory contracts and unexpired leases.

It is well-settled that, in the bankruptcy context, cross-default provisions do not integrate otherwise separate transactions or leases. *See Braniff, Inc. v. GPA Group plc (In re Braniff, Inc.)*, 118 B.R. 819, 845 (Bankr.M.D.Fla.1989) (aircraft purchase and financing agreements); *Wheeling–Pittsburgh Steel Corp.*, 54 B.R. 772, 779 (Bankr.W.D.Pa.1985) (insurance policies); *In re Sambo's Restaurants, Inc.*, 24 B.R. 755, 757–58 (Bankr.C.D.Cal.1982) (restaurant leases). The cross-default provisions must be disregarded in the bankruptcy law analysis, because they are impermissible restrictions on assumption and assignment. *See Sambo's Restaurants*, 24 B.R. at 757–58. Thus, the cross-default provisions in the leases and the note are unenforceable as to the Mt. Vernon lease, if the trustee rejects it.

Furthermore, bankruptcy law requires that the trustee be permitted to reject one of the three leases, while reserving the assumption or rejection of the other two for another day. Consider a business consisting in 666 retail establishments, each operated on leased property.[12] Suppose that the debtor has purchased the entire business from a third party, who has retained a lessor or sublessor interest in each of the properties. Further suppose that, in consequence of intervening circumstances, many but not all of the leases have turned out to be improvident. By artful drafting the seller could try to prevent the debtor from assuming the profitable business locations, and rejecting the unprofitable, and argue that the debtor could only assume or reject the entire 666–store transaction. In the section 365 con-

---

**11.** As in this case, the security interest in *Pacific Express* was unperfected.

**12.** This hypothetical derives from the restaurant business involved in *See Sambo's Restau-rants,* 24 B.R. 755. The court has handled a number of other cases involving large numbers of retail store businesses in many locations.

text, such an argument would make no sense: it would altogether frustrate the ability of the debtor to rehabilitate the business by assuming the profitable portions of the business. Where a debtor has purchased multiple business establishments from a seller in the same transaction, artful drafting of the sales documents cannot be permitted to circumvent section 365.

The court finds that a trustee or debtor in possession is entitled to exercise the rights under section 365 to assume or reject a lease independently as to each business establishment that is property of the estate. A "business establishment," for these purposes, is what the business community ordinarily treats as a business entity or as a unit of commerce. A separate business establishment, for these purposes, does not always exist where a debtor's business is spread out over two or more geographic sites. Rather, each geographic site must constitute a business that can, and typically does, operate separately.

In according significance to multiple business establishments, this court is not alone in the Central District of California. In *Sambo's Restaurants,* Inc., 24 B.R. 755, the lessor had inserted cross-default provisions into each lease in an attempt to tie all the leases into one master agreement which, it argued, had to be assumed or rejected as a whole. However, the court permitted the debtor to reject two of ten restaurant leases, and to pick and choose among the remainder at a later date on the grounds that the enforcement of such a provision impermissibly interfered with the debtor's rights under section 365.

The court finds that a commercial lease, such as the theater lease here at issue, is inherently severable. Here, the Mt. Vernon lease concerns a location separate from that of the other two leases. Moreover, a movie theater is commonly treated as a free-standing business. Thus the trustee may reject the Mt. Vernon lease, while delaying a decision as to the other two leases.

## IV. CONCLUSION

The court finds that the Mt. Vernon lease is separate from the other leases and the other instruments in the purchase transaction, so that the trustee may reject it separately from the other instruments. While the other leases are unexpired also, the court finds that the secured transaction arising from the debtor's purchase of the theater businesses is not executory, and not subject to section 365. Even if the lease here at issue is not independent, the court further finds that it is severable from the other leases and the purchase agreement and note. Thus it is separately rejectable. In consequence, the court grants the trustee's motion to reject the Mt. Vernon lease.